| | |
|---|---|
| **ZYRALE JETER**, duly appointed Administrator of the Estate of Stephen Antwan Patterson, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **AMENDED COMPLAINT** |
| ) | |
| **CORRECT CARE SOLUTIONS, LLC**, in its official capacity, **GRAND PRAIRIE HEALTHCARE SERVICES, P.C.**, in its official capacity, and **ALAN RHOADES, M.D.**, in his individual capacity, ) | |
| ) | |
| Defendants. ) | |

       **COMES NOW** Plaintiff Zyrale Jeter, Administrator of the Estate of Stephen Antwan

Patterson, by and through the undersigned counsel and pursuant to Rule 15 of the North Carolina

Rules of Civil Procedure as a matter of right prior to the service of an Answer or other responsive

pleading, and, for his Amended Complaint complaining of Defendants, alleges and says the

following:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Zyrale Jeter ("Plaintiff") is an adult citizen and resident of Forsyth County,

     North Carolina under no legal disability. Plaintiff has been duly appointed by the Forsyth

     County Clerk of Superior Court as the Administrator of the Estate of Stephen Antwan

     Patterson ("Decedent" or "Patterson") who died intestate on or about May 26, 2017 and,

     as such, is the proper personal representative to bring this wrongful death action on

     behalf of Decedent's Estate.



1

2. On information and belief, at all relevant times, Defendant Correct Care Solutions, LLC ("CCS") was and is a foreign medical corporation or limited liability company formed, organized and/or existing under the laws of the state of Kansas, or some state other than North Carolina, based in Nashville, Tennessee and holding a certificate of authority to operate in North Carolina. Per the most recent Annual Report on file with the North Carolina Secretary of State, CCS currently continues to operate in North Carolina under the name "Correct Care Solutions, LLC." On information and belief, on or about December 6, 2018, CCS was domesticated to Delaware and is now a limited liability company known as "Wellpath, LLC" established and/or existing under the laws of the State of Delaware. At all relevant times, CCS provided medical services to detainees held in custody at the Forsyth County Detention Center, located in Winston-Salem, Forsyth County, North Carolina, by way of a contract with the County of Forsyth. On further information and belief, the registered agent for service of process on CCS is Corporate Creations Network, Inc., 15720 Brixham Hill Avenue #300, Charlotte, NC 28277-4784.

3. On information and belief, at all relevant times, Defendant Grand Prairie Healthcare Services, P.C. ("Grand Prairie") was and is a medical corporation formed, organized and/or existing under the laws of the state of Indiana or some other state outside of North Carolina, based in Nashville, Tennessee, and holding a certificate of authority to operate in North Carolina, that provides medical services to detainees in the Forsyth County Detention Center by way of a contract between CCS and the County of Forsyth and/or by way of a contract or other arrangement between CCS and Grand Prairie. Grand Prairie's predecessor, CCS North Carolina Medical Services, P.C., a North Carolina professional corporation, was merged with and into Grand Prairie pursuant to a written Agreement and Plan of Merger, effective on or about February 24, 2016. On information and belief, Grand Prairie is a subsidiary, affiliate and/or agent of CCS. On further information and

2

belief, the registered agent for service of process on Grand Prairie is Corporate Creations Network, Inc., 15720 Brixham Hill Avenue, #300, Charlottte, NC 28277-4784.

4. On information and belief, Defendant Alan Rhoades, M.D. ("Dr. Rhoades") was at all times relevant to this Complaint a citizen and resident of Forsyth County, North Carolina, a physician duly licensed to practice medicine in the state of North Carolina, and an employee and/or agent of CCS and/or Grand Prairie. On information and belief, Dr. Rhoades currently is a citizen and resident of Rowan County, North Carolina.

5. At the time of his death, and at all times relevant to this Complaint, Decedent was a citizen and resident of Forsyth County, North Carolina. At the time of his death, Decedent was a detainee in the Forsyth County Detention Center.

6. Decedent died intestate and unmarried on or about May 26, 2017 leaving as his heirs at law his biological children, namely: Zyrale Jeter (age 24), Omari Samuels (age 18), Tyriek Samuels, (age 11), Titiana Samuels (age 11) and Solange Davis (age 6).

7. Defendants CCS and/or Grand Prairie provided personnel including doctors, licensed nurse practitioners, nurses, attendants and others for the exclusive care, monitoring, assessment, diagnosis and treatment of detainees at the Forsyth County Detention Center with respect to medical and health related conditions.

8. CCS and/or Grand Prairie and all of their employees, servants, agents and/or apparent agents, including but not limited to Dr. Rhoades, at all times relevant to this Complaint, were health care providers as defined by N.C. Gen. Stat. § 90-21.11. This is a medical malpractice action against Defendants as defined in N.C. Gen. Stat.§ 90-21.11, et seq.

9. Decedent was incarcerated at the Forsyth County Detention Center from on or about May 18, 2017 until he died eight days later on or about May 26, 2017. On information and belief, at all times relevant to this Complaint, CCS and/or Grand Prairie had an exclusive contractual obligation to provide medical services to Decedent through one or more of their employees, servants, agents, and/or apparent agents, including Dr. Rhoades and

3

other medical or nursing personnel. The Contract between CCS and the County of Forsyth states: "It is understood and agreed by [CCS] and the County that all clinical decisions and actions, including those relating to emergent and non-emergent off-site care, are the sole responsibility of [CCS], and that, subject to legitimate security concerns, County staff shall not interfere with an inmate's access to care as determined by [CCS] medical staff."

10. Plaintiff brings this action pursuant to Chapter 28A of the General Statutes of North Carolina for recovery of damages for personal injuries to and the wrongful death of Decedent and pursuant to 42 U.S.C. §§ 1983 and 1988 for deprivation of constitutional rights of Decedent.

11. This Court has jurisdiction over this action, personal jurisdiction over Defendants and venue is proper in this judicial district.

## FACTS

12. The allegations contained in paragraphs 1 - 11 of the Complaint are re-alleged and incorporated by reference as if fully set forth herein.

13. At the time of his death, Decedent was forty years old and was detained in the Forsyth County Detention Facility on a charge of failing to pay child support. Decedent had no history of mental illness, psychiatric hospitalization or outpatient mental health treatment.

14. Decedent was a 1994 graduate of Carver High School. He attended college in Salisbury, North Carolina but did not obtain a degree. He played football in both high school and college. He attended church at Ambassadors Cathedral. He was a licensed barber and was employed over various periods of time at Platinum Palace and Platinum Designer Cuts. He loved all five of his children and was very involved in their lives. He played football and basketball with them at the YMCA, participated with them in school events and activities, cut their hair and taught them how to ride a bike. He also was close to the mothers of his children and their spouses. At times financial constraints made it difficult

4

for Decedent to provide financial support to his children, but Decedent provided financially when he was able and always was personally involved in his children's lives.

15. At the time of his detention on May 18, 2017, Decedent underwent an initial medical screening. Decedent was alert and oriented, and exhibited a logical thought process and appropriate speech. He answered "yes" to the question "Have you ever or are you currently being treated for: asthma, diabetes, seizure disorder, thyroid disorder, heart condition, high blood pressure, bleeding disorder, or kidney disease?" Decedent informed his medical screener to the effect that he had hypertension and was "supposed to be on HTCZ/lisinopril combination pill and has not taken it for over six months because he does not have a provider." The screener referred Decedent to "Medical Provider" for "Chronic Care" but recommended that Decedent be placed in "General Population" rather than "Medical Observational Housing."

16. At the time of his medical screening, Decedent's blood pressure was taken and noted to be 210/140. A blood pressure in that range constitutes a hypertensive crisis that could result in death, serious injury, target end organ damage and/or neurological changes manifesting as altered mental status, confusion and anxiety. Such a condition is considered an urgent condition that merits immediate medication, diagnostic testing such as basic lab work, EKG and/or urinalysis, and appropriate follow-up monitoring and assessment.

17. On May 18, 2017, a Staff Referral Form was generated and made a part of Decedent's chart. The Staff Referral Form noted "routine" chronic care for hypertension. On information and belief, Nurse Practitioner John Rancy wrote an order for Decedent to receive Norvasc (amlodipine) and lisinopril for his hypertension. The ordered medication was started on May 19, 2017.

18. On May 18, 2017, a "Daily Treatment Record" was generated and made a part of Decedent's CCS chart. On information and belief, on the Daily Treatment Record Dr.

5

Rhoades ordered that Decedent's blood pressure be taken and reported once per day for three days (May 19, 20 and 21, 2017). The Daily Treatment Record provides "Upon completion of ordered blood pressure . . . place the completed treatment record into the health record and schedule the patient for a physical evaluation." The Daily Treatment Record further provides: "Report all blood pressures according to protocol to the Physician."

19. The Daily Treatment Record indicates that Decedent had one blood pressure taken on May 19, 2017 that showed a blood pressure of 204/138. On the Daily Treatment Record, Dr. Rhoades noted "previous blood pressure 122/82 on 2/15/17. Why is it elevated now?" Dr. Rhoades signed the foregoing note at 12:00 pm on May 19, 2017. Dr. Rhoades further noted "Blood pressure medications started today" and signed that note at 12:05 pm on May 19, 2017.

20. Despite Dr. Rhoades' order in the Daily Treatment Record, no further blood pressures were taken or recorded after the blood pressure taken on May 19, 2017. Neither Dr. Rhoades nor any other medically trained care provider employed by CCS and/or Grand Prairie ever evaluated or monitored Decedent again, ever took his blood pressure again, ever performed simple diagnostic testing such as blood work, EKG or urinalysis, or ever even bothered to ask Decedent how he was feeling. Defendants failed to make any effort to adequately assess and determine whether the prescribed blood pressure medications were controlling Decedent's elevated blood pressure; failed to adequately follow up with appropriate and basic diagnostic testing and care; failed to adequately document Decedent's condition, vital signs (including blood pressure) and care received; and failed to effectively and adequately observe and appreciate adverse changes in his vital signs, mental status and other signs that his blood pressure remained uncontrolled, dangerously high, and reasonably likely to cause sudden cardiac death, end organ damage, or other serious consequences. In doing so, the medical and nursing staff of CCS and/or Grand

Prairie failed to adhere to the applicable standard of care and failed to properly treat, manage, assess and/or monitor Decedent, directly and proximately causing him to suffer a sudden cardiac death on May 26, 2017 in his cell in the Forsyth County Detention Center. Such conduct was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the acts giving rise to this Complaint.

21. After the Daily Treatment Record was generated on May 19, 2017, there was no documented interaction between Decedent and staff of CCS and/or Grand Prairie, other than routine medication administration by a medical technician, from May 20, 2017 until May 24, 2017. On May 24, 2017 at 12:52 pm, Supervisory Staff Member Amanda Jennings called the charge nurse to assess Decedent after he was reclassified. Supervisory Staff Member Jennings observed Decedent sitting on his bunk getting dressed and noted that he denied injury or suicidal ideations. Under "Plan," Supervisory Staff Member Jennings noted "continue to monitor." There is no record of any assessment of Decedent by the Charge Nurse or any other medically trained member of medical or nursing staff of CCS and/or Grand Prairie.

22. On May 26, 2017 at 5:00 am Medical Technician T. Couthen noted that Decedent refused his Lisinopril and Norvasc.

23. Later on the morning of May 26, 2017, Detention Sergeant Reese and Nurse Thomas encountered Decedent in his cell on morning rounds. Decedent stated to the effect "he was in fear for his life" and that "officers were trying to poison him by putting things in his food." At approximately 7:15 am on May 26, 2017, Decedent informed Detention Sergeant Whitt that his drinking water was "poison." At approximately 8:30 am on May 26, 2017, Decedent stated to Detention Officer Mukerdechian to the effect that "he had received a visit from Jesus Christ" and that "everything was going to be alright."

7

Because Decedent appeared "somewhat delusional" to Detention Sergeant Whitt, he reported Decedent's behavior to Mental Health Caregiver Trueheart and Nurse Swallie at 10:00 am on May 26, 2017. On information and belief, neither Mental Health Caregiver Trueheart nor Nurse Swallie checked on Decedent until after Detention Staff again notified Mental Health Professional Trueheart of further bizarre behavior by Decedent at approximately 4:00 pm on May 26, 2017.

24. On May 26, 2017, at approximately 4:00 pm, Detention Sergeant Reese called Mental Health Caregiver Trueheart due to Decedent's altered mental status and bizarre behavior. Mental Health Caregiver Trueheart found Decedent sitting on his bunk. He responded to his name but would not respond to questions. Decedent's cell floor appeared to be smeared with feces and it appeared Decedent had vomited in his toilet. Decedent refused to come to the cell door but remained on his bunk, rocking and tapping his fingers on the mattress while counting.

25. Mental Health Caregiver Trueheart placed Decedent on mental health observation/suicide watch at 4:00 pm on May 26, 2017. Under "Treatment Goals," the Suicide Watch Initial Assessment states "patient to see Dr. Cunningham 5/30/17 to determine if medications are appropriate; decrease incidents of bizarre behavior and smearing feces."

26. On May 26, 2017 at approximately 4:20 pm, Detention Officers Surratt and Westbury found Decedent non-responsive and slumped over the corner of his bunk. The Detention Officers and Sergeant Reese entered Decedent's cell and discovered that Decedent had no pulse.

27. Detention Officer Surratt called the charge nurse at approximately 4:45 pm. Charge Nurse Douthit and other medical staff arrived at approximately 4:52 pm and began administering cardiopulmonary resuscitation (CPR).

28. Dr. Rhoades arrived at Decedent's cell and observed the CPR efforts until EMS arrived and took over. Decedent was not able to be resuscitated and died.

8

29. An autopsy was performed on Decedent and the pathologist performing the autopsy found the cause of death to be "probable cardiac dysrhythmia due to hypertensive cardiovascular disease."

30. Defendants failed to make any effort to adequately assess and determine whether the prescribed blood pressure medications were controlling Decedent's elevated blood pressure; failed to adequately follow up with appropriate and basic diagnostic testing and care; failed to adequately document Decedent's condition, vital signs (including blood pressure) and care received; and failed to effectively and adequately observe and appreciate adverse changes in his vital signs, mental status and other signs that his blood pressure remained uncontrolled, dangerously high, and reasonably likely to cause sudden cardiac death, end organ damage, or other serious consequences. In doing so, Dr. Rhoades and the medical and nursing staff of CCS and/or Grand Prairie failed to properly treat, manage, assess and/or monitor Decedent and failed to act in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the acts giving rise to this Complaint, directly and proximately causing Decedent to suffer a sudden cardiac death.

### FIRST CLAIM FOR RELIEF
**(Wrongful Death Claim Against Defendants CCS and/or Grand Prairie; Dr. Rhoades)**

31. The allegations contained in paragraphs 1 - 30 of the Complaint are re-alleged and incorporated by reference as if fully set forth herein.

32. At all relevant times, CCS and/or Grand Prairie provided medical monitoring, care and treatment to detainees at the Forsyth County Detention Center under the laws and regulations of the State of North Carolina and pursuant to a contractual arrangement with the County of Forsyth. CCS represented to Forsyth County, in its Proposal for Contract and otherwise, that it operated with professional staff, including doctors and nurse

9

practitioners who are competent, proficient and able to render skilled, appropriate and adequate detainee monitoring and treatment.

33. At all relevant times, CCS and/or Grand Prairie and Dr. Rhoades maintained a physician-medical provider/patient relationship with Decedent and owed him a duty to act according to the applicable medical standard of care to prevent unreasonable harm.

34. At all relevant times, the members of the medical and nursing staff attending Decedent, including Dr. Rhoades, were employees, servants, agents and/or apparent agents of CCS and/or Grand Prairie and were acting within the scope of their employment.

35. The foregoing negligence of Dr. Rhoades and other medical and nursing staff employed by CCS and/or Grand Prairie occurred at the Forsyth County Detention Center while Defendants were providing medical services to detainees pursuant to the Contract by and between CCS and the County of Forsyth, and CCS and/or Grand Prairie are liable for their agents' negligence through the doctrine of *respondeat superior*.

36. In addition, on information and belief, CCS and/or Grand Prairie were separately and directly negligent in that:

    a.    They failed to provide competent professional personnel to adequately monitor, evaluate and treat detainees at the Forsyth County Detention Center between May 19, 2017 and May 26, 2017 who were capable of properly monitoring, evaluating and treating Decedent;

    b.    They negligently permitted incompetent, untrained, and poorly supervised medical personnel to work at the Forsyth County Detention Center between May 19, 2017 and May 26, 2017;

    c.    They failed to properly train, supervise, direct and manage their employees, servants, agents and apparent agents to ensure that they were properly treating and monitoring the condition of Decedent;

    d.    They failed to ensure that their agents properly monitored Decedent, including carefully charting and documenting changes in his vital signs and other signs and symptoms of his uncontrolled hypertension; and

    e.    They failed to establish and/or enforce appropriate procedures for preventing, recognizing, treating and documenting changes in signs and symptoms that should have alerted staff to Decedent's uncontrolled hypertension.

Such conduct constituted a breach by CCS and/or Grand Prairie of their administrative and/or corporate duties to Decedent, as well as a breach of the applicable medical standards of practice.

37. Defendants Dr. Rhoades and CCS and/or Grand Prairie, directly and/or through the negligence of their employees, servants, agents and/or apparent agents, as alleged above, (1) provided care to Decedent that was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the care provided to Decedent, (2) failed to use best medical judgment, and/or (3) failed to exercise reasonable care and diligence in the care and treatment provided to Decedent.

38. In addition, pursuant to N.C. Gen. Stat. § 28-A-18-2, the negligence of Defendants Dr. Rhoades and CCS and/or Grand Prairie, directly and by and through their employees, servants, agents and apparent agents, constituted a wrongful act, neglect or default that directly and proximately caused injury to and the death of Decedent and that would have entitled Decedent to an action for damages had he lived.

39. Plaintiff, on behalf of Decedent's estate, claims damages including, *inter alia*:

    a.    Funeral and burial expenses; and

    b.    The present monetary value of Decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected net income of Decedent, services, protection, care and assistance of Decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered, society, companionship, comfort, guidance, kindly offices and advice of Decedent to the persons entitled to the damages recovered.

40. As a result, Plaintiff is entitled to recover damages from Defendants, jointly and severally, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) for the wrongful death of Decedent as the direct and proximate result of the negligent acts and

omissions of Defendants Dr. Rhoades and CCS and/or Grand Prairie directly and by and through their employees, servants, agents and/or apparent agents.

## SECOND CLAIM FOR RELIEF
**(Survival Claim Against Defendants CCS and/or Grand Prairie; Dr. Rhoades, Gen. Stat. § 28A-18-1)**

41. The allegations contained in paragraphs 1 - 40 of the Complaint are hereby re-alleged and incorporated by reference as if fully set forth herein.

42. At all relevant times, CCS and/or Grand Prairie provided medical monitoring, care and treatment to detainees at the Forsyth County Detention Center under the laws and regulations of the State of North Carolina and pursuant to its contractual arrangement with the County of Forsyth. CCS represented to Forsyth County, in its Proposal for Contract and otherwise, that it operated with professional staff, including doctors and nurse practitioners who are competent, proficient and able to render skilled, appropriate and adequate detainee monitoring healthcare and treatment.

43. At all relevant times, Dr. Rhoades and CCS and/or Grand Prairie maintained a physician-medical provider/patient relationship with Decedent and owed him a duty to act according to the applicable medical standard of care to prevent unreasonable harm.

44. At all relevant times, the members of the medical and nursing staff attending Decedent, including Dr. Rhoades, were employees, servants, agents and/or apparent agents of CCS and/or Grand Prairie and were acting within the scope of their employment or agency.

45. The foregoing negligence Dr. Rhoades and other medical staff employed by CCS and/or Grand Prairie occurred at the Forsyth County Detention Center while CCS and/or Grand Prairie were providing medical services to detainees pursuant to the Contract by and between CCS and the County of Forsyth and CCS and/or Grand Prairie are liable for their agents' negligence through the doctrine of *respondeat superior*.

46. In addition, on information and belief, CCS and/or Grand Prairie were separately and directly negligent in that:

a. They failed to provide competent professional personnel to adequately monitor, evaluate and treat detainees at the Forsyth County Detention Center between May 19, 2017 and May 26, 2017 who were capable of properly monitoring, evaluating and treating Decedent;

b. They negligently permitted incompetent, untrained, and poorly supervised medical personnel to work at the Forsyth County Detention Center between May 19, 2017 and May 26, 2017;

c. They failed to properly train, supervise, direct and manage their employees, servants, agents and apparent agents to ensure that they were properly treating and monitoring the condition of Decedent;

d. They failed to ensure that their agents properly monitored Decedent, including carefully charting and documenting changes in his vital signs and other signs and symptoms of his uncontrolled hypertension; and

e. They failed to establish and/or enforce appropriate procedures for preventing, recognizing, treating and documenting changes in signs and symptoms that should have alerted staff to Decedent's uncontrolled hypertension.

Such conduct constituted a breach by CCS and/or Grand Prairie of their administrative and/or corporate duties to Decedent, as well as a breach of the applicable medical standards of practice.

47. Defendants Dr. Rhoades and CCS and/or Grand Prairie, directly and/or through the negligence of their employees, servants, agents and/or apparent agents, as alleged above, (1) provided care to Decedent that was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the care provided to Decedent, (2) failed to use best medical judgment, and/or (3) failed to exercise reasonable care and diligence in the care and treatment provided to Decedent.

48. In addition, pursuant to N.C. Gen. Stat. § 28A-18-1, the negligence of Defendants Dr. Rhoades and CCS and/or Grand Prairie, directly and by and through their employees, servants, agents and apparent agents, constituted a wrongful act, neglect or default that directly and proximately caused injury to and the death of Decedent and that would have entitled Decedent to an action for damages had he lived.

13

49. Plaintiff, as personal representative of Decedent's Estate, brings this claim for personal injuries, pain and suffering and other damages that arose and were suffered by Decedent prior to his death, pursuant to N.C. Gen. Stat. § 28A-18-1.

50. Due to the negligence of Defendants Dr. Rhoades and CCS and/or Grand Prairie, directly and by and through their employees, servants, agents and/or apparent agents, as set forth above, Decedent suffered severe pain and suffering in the time before he died on May 26, 2017. Decedent suffered extensive pre-death injuries, including but not limited to, extreme pain and suffering, loss of dignity, mental anguish, loss of capacity for enjoyment of life, discomfort, and extensive medical expenses, all directly and proximately caused by the negligence of CCS and/or Grand Prairie, directly and by and through their employees, agents, apparent agents and servants.

51. As a result, Plaintiff is entitled to recover damages from Defendants, jointly and severally in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) by reason of the injuries to Decedent as the direct and proximate result of the negligent acts and omissions of Defendants Dr. Rhoades and CCS and/or Grand Prairie, directly and by and through their employees, servants, agents and/or apparent agents.

### THIRD CLAIM FOR RELIEF
**(Violations of Federal Civil Rights Laws 42 U.S.C. § 1983 and 1988 by Dr. Rhoades in His Individual Capacity)**

52. The allegations contained in paragraphs 1 - 51 of the Complaint are hereby re-alleged and incorporated by reference as if fully set forth herein.

53. Defendant Dr. Rhoades acted individually under color of state law, customs, practices, usage or policy at all times referenced herein as the Sheriff's agent or employee and had certain duties imposed upon him with regard to Decedent.

54. Defendant Dr. Rhoades violated Decedent's rights under the United States Constitution, including rights secured by the Eighth and Fourteenth Amendments, and/or federal law, by intentionally, willfully, maliciously and with conscious and deliberate indifference,

14

failing to secure adequate and reasonable medical care for Decedent when he subjectively knew or should have known that Decedent had an objectively serious medical need and faced a substantial risk of harm, and by disregarding such risk of harm and by failing to take reasonable measures that were readily available to avoid that risk.

55. Defendant Dr. Rhoades had actual knowledge that Decedent had a dangerously elevated blood pressure that required immediate medical attention and monitoring. Decedent's condition would have been diagnosed by a physician as mandating treatment and/or was so obvious that even a layperson would easily recognize the necessity for medical attention and monitoring. Dr. Rhoades failed to adequately monitor Decedent. His failure to do so and deliberate indifference ultimately led to Decedent's death.

56. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and is a right that any reasonable medical care provider in the position occupied by Dr. Rhoades knew or should have known. As a result, the defense of qualified immunity is unavailable to and has been waived by the Defendant.

57. As a direct and proximate result of the deprivation of Decedent's constitutional and federal rights as alleged herein, Decedent died a painful, preventable and unnecessary death. Plaintiff, on behalf of Decedent's Estate, is entitled to recover from Dr. Rhoades, in his individual capacity, damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

58. Furthermore, Plaintiff, on behalf of Decedent's Estate, is entitled to recover punitive damages as set forth in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Dr. Rhoades for his illegal, unconstitutional, wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## FOURTH CLAIM FOR RELIEF
### (Violations of Federal Civil Rights Laws 42 U.S.C. § 1983 and 1988 by CCS and/or Grand Prairie in their Official Capacity)

59. The allegations contained in paragraphs 1 - 58 of the Complaint are hereby re-alleged and incorporated by reference as if fully set forth herein.

60. At all relevant times, CCS and/or Grand Prairie were persons acting under color of state law because they were performing a function traditionally within the exclusive prerogative of the Sheriff and thus became the functional equivalent of the Sheriff under 42 U.S.C. § 1983, and were responsible exclusively for the formulation and execution of policies regarding the medical care provided to detainees at the Forsyth County Detention Center.

61. On information and belief and at all relevant times, CCS and/or Grand Prairie, acting under color of state law, had in effect policies, practices and/or customs that constituted deliberate indifference to Decedent's serious medical needs and that were a direct and proximate cause of the wrongful, unconstitutional and unlawful conduct of the medical and nursing staff who worked at the Forsyth County Detention Center and the death of Decedent, as alleged above. The CCS Proposal for Services states, in part: "Our focus is to operate a legally defensible health care program via a written healthcare plan with clear objectives, site-specific policies and procedures . . . and federal, state, and local laws, statutes and ordinances governing health care service delivery."

62. On information and belief, such policies are largely motivated by a commitment by CCS and/or Grand Prairie to an overall goal of cost-cutting/saving. In its Proposal for Contract, CCS touted its success in another county in "decreasing and stabilizing health care costs, which included keeping the [county's] Per Inmate Per Day (PIPD) costs flat for five years." On information and belief, CCS and/or Grand Prairie achieve such cost-cutting/saving objectives by providing minimal on-site care to detainees. Decedent's uncontrolled hypertension easily could have been identified and controlled with basic on-

16

site monitoring and assessment, such as basic metabolic lab testing, EKG and urinalysis, such that the cost-cutting/saving custom or policy of CCS and/or Grand Prairie was a moving force in Decedent's death.

63. Such policies, practices and/or customs include, among other things:

    a.    The failure to adequately train, supervise, instruct or monitor medical and nursing staff in the proper method for evaluating detainees;

    b.    The failure to adequately train, supervise, instruct or monitor medical and nursing staff in the proper method for assisting and treating detainees with serious medical conditions;

    c.    The failure to see that proper methods were being employed to evaluate the conditions of detainees in the Forsyth County Detention Center;

    d.    The failure to see that proper methods were being employed to assist and treat detainees in the Forsyth County Detention Center with serious medical conditions;

    e.    The failure to properly supervise medical and nursing staff assigned to the Forsyth County Detention Center and the failure to see that medical and nursing staff monitored detainees sufficiently to be at all times informed of the detainees' general health and medical needs;

    f.    The policy of emphasizing cost containment efforts and de-emphasizing or minimizing diagnostic testing and/or aggressive medical treatment, in an effort to reduce per inmate per day costs;

    g.    The failure to institute proper policies or procedures necessary to see that detainees were provided appropriate, necessary and adequate medical care, including diagnostic testing where indicated, and protection from emergency and dangerous medical conditions;

    h.    If such policies or procedures existed, the failure to enforce and/or follow them in providing for the appropriate medical care necessary for Decedent's well-being; and

    i.    The failure to implement, follow or enforce other policies, customs and practices to be identified during discovery or trial.

64. The foregoing policies or customs of CCS and/or Grand Prairie arose through express policy, through the decisions of persons with final policymaking authority, through omission that manifests deliberate indifference to the rights of detainees, and/or through

17

practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

65. On information and belief, CCS and/or Grand Prairie had actual or constructive knowledge that medical and/or nursing staff were and had been, prior to May 26, 2017, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to detainees such as Decedent.

66. On information and belief, the response of CCS and/or Grand Prairie to such actual or constructive knowledge, even after repeated instances of injury or death of detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices alleged herein. By their conduct, CCS and/or Grand Prairie created and/or encouraged a culture of neglect and indifference toward detainees, including Decedent.

67. On information and belief, the misconduct of medical and/or nursing staff at the Forsyth County Detention Center and other detention facilities served by CCS and/or Grand Prairie, including but not limited to, the deprivation of constitutional rights of detainees and the failure to provide reasonable medical and mental health care to detainees, had occurred on multiple prior occasions and was widespread in the Forsyth County Detention Center and other detention facilities served by CCS and/or Grand Prairie. For example, on information and belief, between 2011 and 2014, at least seven inmates/detainees died while incarcerated in the Forsyth County Detention Center due to inadequate or improper care from nursing and/or medical staff. CCS and/or Grand Prairie had actual or constructive knowledge of the multiple, documented, and widespread instances of misconduct and/or inadequate care by nursing staff, yet took no steps to prevent such misconduct.

68. As a direct and proximate result of said policies, practices and customs, Decedent's rights under the United States Constitution, including rights secured by the Eighth and Fourteenth Amendments and/or federal law, were violated.

69. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and is a right that any reasonable medical care provider in the position occupied by CCS knew or should have known. The CCS Proposal for Contract states: "CCS will ensure care consistent with an inmate's rights under the U.S. Constitution and State of North Carolina codes related to health care of incarcerated individuals. Inmates have a right to access health care services. Inmates have a right to professional medical judgment. An inmate has a right to care that has been ordered." As a result, the defense of qualified immunity is unavailable to and has been waived by CCS and/or Grand Prairie.

70. As a direct and proximate result of the deprivation of Decedent's constitutional and federal rights as alleged herein, Decedent died a painful, preventable and unnecessary death. Plaintiff, on behalf of Decedent's Estate, is entitled to recover from CCS and/or Grand Prairie, in their official capacities, damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

71. Furthermore, Plaintiff, on behalf of Decedent's Estate, is entitled to recover punitive damages against CCS and/or Grand Prairie, jointly and severally, as set forth in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish CCS and/or Grand Prairie for their illegal, unconstitutional, wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## RULE 9(j) CERTIFICATION

72. Plaintiff objects to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this Rule seems to require plaintiffs to prove their case before factual discovery has even begun, that this Rule denies medical malpractice plaintiffs their rights of due process and equal protection under the law, of the right to open courts, and of the right to a jury trial (in violation of both the United States and North Carolina constitutions). Furthermore, Rule 9(j) is an unconstitutional violation of the following:

(a) Amendment VII and Amendment XIV of the United States Constitution; and (b) Article I, Sections 18, 19, and 25 of the North Carolina Constitution.

73. Without waiving these objections, in compliance with the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure, this pleading specifically asserts that the medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiff after reasonable inquiry have been reviewed by a person or persons who is/are reasonably expected to qualify as expert witnesses under Rule 702 of the North Carolina Rules of Evidence and who is/are willing to testify that the medical care did not comply with the applicable standard of care. In addition, should a court later determine that anyone who has reviewed the medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiff after reasonable inquiry does not meet the requirements of 702(b) or 702(c) of the North Carolina Rules of Evidence, then Plaintiff will seek to have such person(s) qualified as an expert witness by motion under Rule 702(e) of the North Carolina Rules of Evidence. Plaintiff does not waive his objections on the grounds previously stated to the purported certification requirements of Rule 9(j) by providing this certification, and Plaintiff specifically reserves the right to assert any and all objections to any "discovery" related to Rule 9(j).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays the court that:

1. Plaintiff have and recover against Defendants, jointly and severally, compensatory, economic and/or non-economic damages pursuant to N.C. Gen. Stat. §§ 28A-18-2 and 90-21.11, et seq., and 42 U.S.C. §§ 1983 and 1988 in an amount in excess of $25,000.00;

2. Plaintiff have and recover against Defendants, jointly and severally, punitive damages pursuant to N.C. Gen. Stat. §§ 28A-18-2, 90-21.11, et seq. and 1D-1, et seq., and 42 U.S.C. §§ 1983 and 1988 in an amount to be determined by a jury and as allowed by law;

3. Plaintiff have and recover costs, pre-judgment and post-judgment interest as allowed by law, and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 or as otherwise allowed by law;

4. A trial by jury be had on all issues so triable; and

5. Plaintiff have and recover such further relief as the Court may deem just, equitable, and proper.

This the 8 th day of January, 2019.

MORROW PORTER VERMITSKY
& TAYLOR, PLLC

John N. Taylor, Jr.
NC State Bar No. 16064
**John C. Vermitsky**
NC State Bar No. 35627
3890 Vest Mill Road (27103)
P.O. Box 25226
Winston Salem, NC 27114-5226
Tel: (336) 760-1400
Fax: (336) 760-4520
Email: jtaylor@morrowporter.com
Email: jvermitsky@morrowporter.com

For SWG

Steven W. Grainger, Esq.
NC State Bar No. 43973
Grainger Law, PLLC
3540 Clemmons Road, Suite 300
Clemmons, NC 27012
Tel: (336) 941-9084
Fax: (336)-232-1518
Email: swgrainger@grainger-law.com